1
2
3
4
5
6
7 **UNITED STATES DISTRICT COURT**
8 **SOUTHERN DISTRICT OF CALIFORNIA**
9

10 NANCY STEVENS,                                    CASE NO. 09cv2565-WQH-RBB

11                              Plaintiff,          **ORDER**
                        vs.
12 OPTIMUM HEALTH INSTITUTE –
   SAN DIEGO, ROBERT NEES, and
13 DOES 1 through 20, inclusive,
14                              Defendants.

15 HAYES, Judge:

16          The matters before the Court are Plaintiff's Motion for Partial Summary Judgment (ECF

17 No. 68), and Defendants' Motion for Summary Judgment and/or Partial Summary Judgment

18 (ECF No. 69).

19 **I.      Background**

20          On November 13, 2009, Plaintiff initiated this action by filing a Complaint. (ECF No.

21 1). On January 13, 2010, Plaintiff filed a Second Amended Complaint, which is the operative

22 pleading. (ECF No. 8). Plaintiff, who is blind, alleges Defendants Optimum Health Institute

23 – San Diego ("OHI") and Robert Nees violated the California Unruh Civil Rights Act ("Unruh

24 Act"), Cal. Civ. Code § 51, *et. seq.*, by denying her services in a business establishment

25 because of her disability, and the California Disabled Persons Act ("Disabled Persons Act" or

26 "DPA"), Cal. Civ. Code § 54, *et. seq.*, by denying her access to a place of public

27 accommodation because of her disability. Plaintiff seeks damages, declaratory relief,

28 injunctive relief, and attorneys' fees and costs.

On February 26, 2010, Defendants filed a Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that the Unruh Act and the DPA are not applicable to OHI.  (ECF No. 26).

On May 5, 2010, the Court issued an Order denying the Motion to Dismiss.  (ECF No. 26).  The Court stated: "[D]etermining whether these laws apply to a non-profit religious corporation requires a court to examine a factual record of the entity's practices, services, and interaction with members of the public, among other factors.  The Court concludes that evidentiary analysis is not appropriate at the motion to dismiss stage."  *Id*. at 8 (citations omitted).

On March 15, 2011, Plaintiff filed the Motion for Partial Summary Judgment (ECF No. 68), and Defendants filed the Motion for Summary Judgment and/or Partial Summary Judgment (ECF No. 69).  The parties attached evidence to their respective motions.  The parties also filed a Stipulation of Facts for Purposes of Summary Judgment Only ("Stipulation of Facts").  (ECF No. 67).

On April 8, 2011, the parties filed opposition briefs and evidentiary objections.  (ECF Nos. 79, 80).

On April 15, 2011, the parties filed reply briefs.  (ECF Nos. 82, 83).

On April 28, 2011, the Court conducted oral argument on the pending motions.  (ECF No. 87).

## II.  Facts

Defendant OHI is a non-profit, religious organization which "operates a holistic health program in Lemon Grove, California."  (Stipulation of Facts ¶¶ 2, 4, 66; ECF No. 67).  OHI "is a subordinate organization of Free Sacred Trinity Church," which is a non-profit, religious organization that "commissions missions to carry out the church's programs and promote its beliefs."  *Id*. ¶¶ 1, 3, 5-6.  OHI's website provides that the Free Sacred Trinity Church ("FSTC") is a "non-denominational church rooted in early Judeo-Christian doctrine," and its "primary ministry is one of healing carried out at its Mission, the Optimum Health Institute."  *Id.* ¶¶ 41-42.

"A primary function of [OHI] is to teach its specific program to attendees." *Id.* ¶ 19. OHI's "facilities are used to host its program," and OHI "is not a recreational facility." *Id.* ¶¶ 20-21. "Members of the public who are not enrolled in [OHI]'s program cannot participate in the program." *Id.* ¶ 23. OHI is a gated facility and OHI "exercises control over who may visit [OHI] and attend its programs." *Id.* ¶¶ 32-33. OHI has an on-site chapel which is used for religious worship and teaching, and OHI "provides religious materials to its guests including Bibles, upon request." *Id.* ¶¶ 35-38. OHI's website states: OHI is a "spiritual retreat" and a "safe and sacred place" with a "monastic-like setting"; "people from all religious traditions" who attend OHI "gather in prayer circles ... where they share how their stay at OHI has transformed their lives as a result of miraculous healings on all levels"; OHI has a specific set of values that are based on "ancient spiritual disciplines"; and OHI's history includes "biblically and essene based dietary and cleansing practices." *Id.* ¶¶ 49, 51-53, 57, 61. OHI conducts daily prayer circles and daily liturgies as part of its program. *Id.* ¶¶ 87-88.

"OHI does not make decisions about who may attend its program based on religious beliefs." *Id.* ¶ 89. Attendees of OHI's program who are not missionaries or employees of Free Sacred Trinity Church "are not required to adhere to any specific religious value or belief or ... be a member of OHI or FSTC." *Id.* Attendees of OHI's program who are not missionaries or employees of Free Sacred Trinity Church "are not required to participate in any of the activities offered by OHI during its program, including, for example, prayer circles or other religious activities, although their participation is encouraged." *Id.* ¶ 91.

Defendant Nees, the Ecclesiastical Superior of the Free Sacred Trinity Church, submitted two Declarations. (ECF Nos. 69-2, 80-2.) Nees stated:

> The Church and [OHI] welcome all persons, including disabled persons, with the exception that neither the Church nor the Institute allows persons to proselytize other faiths, ... [be] disruptive, ... [or] interfere with or otherwise disrupt the spiritual paths of those attending the Institute.... In the past, I have required persons disrupting the Institute's program to leave the mission for doing such things as proselytizing a different faith....

> [OHI] charges a monetary fee as tuition to participate in its program, which serves as a source of funding for the program.

(Nees Decl. ¶¶ 19-20, 22; ECF No. 69-2). Nees stated:

As part of the program, inquirers and adherents may reside at OHI in guest rooms.  But OHI is not a hotel.  Instead, the guest rooms are intended to enhance the monastic experience of the OHI's holistic health.  OHI's accommodations and grounds, including a prayer chapel and other areas for meditation, are designed and maintained to create a sacred space for the Holy Spirit and a setting conducive to spiritual reflection and rejuvenation.  These differences also demonstrate how OHI is different than a secular health spa; OHI's program is religious and religion is infused in all aspects of the OHI program....

Although much of the OHI program focuses on diet, food preparation, and ritual purification, the Church's ultimate goal is to bring the participants to an understanding of their purpose in life and to get them to affirm or reaffirm the reality of God....

We believe that all paths eventually lead to Jesus Christ as Lord and Savior.  For this reason, we do not evangelize to OHI's participants.

(Nees Decl. ¶¶ 10, 15-16; ECF No. 80-2).

Nees stated:

[T]he Church uses the words 'inquirer' and 'adherent' to refer to individuals who come to learn of, and to those who have accepted, respectively, the theology and practices of the Church....  All first-time guests at OHI mission [are] 'inquirer[s]' within the view of the Church.  Those individuals who thereafter return to an OHI mission for additional teaching are 'adherents' within the view of the Church.  During periods when they are in residence at an OHI mission, both 'inquirers' and 'adherents' are sometimes referred to as 'guests.'"
...

Those adherents who frequently come to an OHI mission may, from time-to-time, refer to themselves as a 'member' of FSTC.  However, ... the formal or legal Membership of OHI is limited to only those individuals who serve on FSTC's Board of Elders....  [T]here are approximately 22,000 individuals who are 'adherents' in the eyes of the Free Sacred Trinity Church.

*Id.* ¶¶ 38-39, 41.

OHI's website states: "By 2006, the Optimum Health Institute, as the primary healing ministry of FSTC, has helped over 100,000 people."  (ECF NO. 67-1 at 32).  OHI's website contains articles which describe OHI as "an educational institute where people come to cleanse their bodies and to learn improved eating habits," and "the best bargain in health retreats in the country."  (ECF No. 67-1 at 87, 92).

Plaintiff submits a Declaration from Ruth Haynes, who stated:

I attended the wellness program at [OHI] in ... 2007....  I was registered in the program as a 'guest.'  Throughout my stay at OHI, staff members repeatedly referred to me and other attendees as 'guests'....  I was not an 'adherent' and do not ... know what that term means....  I am not now a member of any church or organized religion, nor was I at the time of my visit to the OHI facilities.

(ECF No. 21-2 at 1-2).  Plaintiff submits a Declaration from Dixie Boggs, who stated:

> I attended the wellness program at [OHI] ... numerous times over the course of several years and, as a three month missionary volunteer, I worked in the main kitchen each week and I [led] the morning lymphatic exercise class.  OHI offers a cleansing and dextoxification program to improve physical and mental health....  When I participated in the program offered at OHI, I was either registered as a guest or I was a missionary volunteer.  Staff members referred to me as a 'guest' or as a 'missionary volunteer.'  At no time was I required to become a member of OHI or of Free Sacred Trinity Church in order to attend the wellness program at OHI, to register in the program or to serve as a missionary volunteer....  I am not now a member of any church or organized religion, nor was I a member of any church or organized religion at the time of my visits to the OHI-San Diego facility.

(ECF No. 21-3 at 1-2).

Plaintiff, a resident of Bend, Oregon, "is blind and uses a guide dog or cane because of her disability."  (Stipulation of Facts ¶ 65; ECF No. 67).  In February 2009, Plaintiff telephoned OHI "to ask about the cost of OHI's holistic health program."  *Id*. ¶ 67.  Plaintiff was told that "the program was three weeks long and that she could split the weeks so that [Plaintiff] could visit the facility for a week prior to her scheduled cancer surgery."  *Id*.  Plaintiff was told that "she could not bring her guide dog to the facility," and Plaintiff responded that "she desired to try OHI's program for one week, using just her cane."  *Id.* ¶¶ 72-73.

During later phone conversations with OHI representatives, Plaintiff was told that "she could only attend the program if [Plaintiff] brought someone with her" because "not only was OHI concerned that [Plaintiff] would fall down stairs, OHI was also concerned that she might injure her hand in a juicing machine, given [Plaintiff]'s blindness."  *Id*. ¶¶ 77-78.  Over the course of multiple phone conversations in February 2009 and April 2009, Plaintiff told OHI representatives that "she did not need anyone's assistance, that she was independent and able to care for herself"; "she has lived independently for over 20 years"; "she has traveled all over the world as part of a paralympic ski team and as the world champion blind woman triathlete"; "she travels independently wherever she goes, utilizing public transportation and her excellent mobility skills"; and "she has skillfully managed all of her household appliances and food preparation utensils, including knifes, food processors and blenders."  *Id*. ¶¶ 78, 81.  An OHI representative told Plaintiff that she would not be permitted to attend the OHI program by

herself "because, among other reasons, there were too many stairs." *Id.* ¶ 80.  The OHI

representative stated that "OHI would 'compromise' by letting [Plaintiff] bring a companion

with her and OHI would only charge [Plaintiff] half-price for the companion." *Id.*  Plaintiff

informed Defendants that this requirement was "an unnecessary and significant burden on

her," and Plaintiff offered to "tour[] the OHI facility and ... show Nees that she could

successfully navigate the OHI facility." *Id.* ¶ 81.  "OHI told [Plaintiff] that she would be

welcome at OHI, but only if she brought a companion." *Id.* ¶ 84.

Nees sent Plaintiff an e-mail which stated that "guests are required to be able to care for

themselves without staff intervention" and the OHI staff could not "guide guests on an

individual basis." *Id.* ¶ 82.  Nees stated that OHI takes "our guests['] safety from a higher

authority th[a]n from a simple legal perspective." *Id.*  In a Declaration, Nees stated:

> The grounds of OHI are sacred.  In order to maintain a pure environment for healing and worship, OHI cannot–and does not–welcome animals.... [I]n the eyes of the Church, based upon the teachings of the Old Testament, OHI's grounds are sacred but animals are not....  Allowing animals into the grounds is antithetical to the promotion of a safe, healing environment at the Institute, particularly for people who have animal phobias or allergies....
>
> In my role as Ecclesiastical Superior, I determined that even a remote chance of Plaintiff, attending OHI without a sighted companion, needing assistance in the unfamiliar environment of OHI or during the OHI program, posed an unacceptable risk of disrupting the spiritual path of others in attendance.

(Nees Decl. ¶¶ 17-18, 29; ECF No. 80-2).

### III.   Subject Matter Jurisdiction

The Second Amended Complaint alleges that the Court has subject matter jurisdiction

over this action pursuant to 28 U.S.C. § 1332.

On April 18, 2011, the Court issued an Order stating that "Plaintiff shall file a

submission demonstrating that her claim meets the amount in controversy necessary for

diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332." (ECF No. 84).

On April 26, 2011, Plaintiff filed a response to the Court's April 18, 2011 Order. (ECF

No. 85).  Plaintiff contends that her actual damages, statutory minimum damages and

anticipated attorney's fees each exceed $75,000.

On June 8, 2011, Defendants filed a reply to Plaintiff's response.  (ECF No. 88).

Defendants concede that "Plaintiff's argument concerning the potential for an award of attorney's fees may be supported by existing Ninth Circuit precedent...." *Id.* at 2.

Federal courts are courts of limited jurisdiction, and possess only that power authorized by the Constitution and federal statute. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). This Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States...." 28 U.S.C. § 1332(a). "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3). A court may raise the question of subject matter jurisdiction, sua sponte, at any time during the pendency of the action, even on appeal. *See Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002).

When alleging the jurisdictional amount to maintain a suit in diversity, a plaintiff must demonstrate a good faith, minimally reasonable belief that the suit might result in a judgment in excess of that amount. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938). Once a plaintiff's jurisdictional allegations are challenged, the plaintiff bears the burden of proving his claim meets the jurisdictional amount. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Sanchez v. Monumental Life Ins. Co.*, 102 F.2d 398, 403-04 (9th Cir. 1996). If it appears to a legal certainty that the claim is actually for less than the requisite jurisdictional amount, the Court must dismiss. *See St. Paul Mercury Indemnity Co.*, 303 U.S. at 288 ("[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal...."); *see also Sanchez*, 102 F.3d at 402 ("[T]he *St. Paul Mercury* 'legal certainty' test is applicable in ... cases ... brought in the federal court in which the plaintiff has filed a good faith complaint alleging damages in excess of the required jurisdictional minimum....").

The Second Amended Complaint adequately alleges that all parties are of diverse citizenship and the amount in controversy exceeds $75,000. After reviewing the submissions of the parties, the Court finds that Plaintiff has adequately shown that her claim meets the

jurisdictional amount in controversy requirement. *Cf. Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) ("[W]here an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy."). The Court finds that subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332.

## IV.    Contentions of the Parties

Plaintiff moves for summary judgment on the issue of Defendants' liability under the Unruh Act and the DPA and "for an injunctive order requiring Defendants to allow people with sight impairments to exercise their judgment and discretion regarding participation in OHI's health program, with or without an assistant." (ECF No. 68-1 at 5). Plaintiff also moves "for an order enjoining Defendants from preventing or causing the prevention of a guide dog, signal dog, or service dog from carrying out its functions in assisting a disabled person who attends OHI's detoxification program or who visits OHI's health center in Lemon Grove, California." *Id*. "Plaintiff reserves the issues of damages and attorney fees." (ECF No. 68 at 2).

Defendants contend that they are entitled to summary judgment for three reasons:

> 1.    First and most fundamentally, in order to prevail on her statutory claims, Plaintiff must be able to establish that OHI is a business establishment or public accommodation. However, the stipulated facts, standing alone, provide a complete basis upon which this Court can conclude as a matter of law that Plaintiff cannot do so. In the absence of proof that OHI is a business establishment or public accommodation, Plaintiff's claims fail as a matter of law.
>
> 2.    Next, summary judgment in favor of Defendants is warranted even if this Court were to conclude a material fact remains in issue whether OHI is a business establishment or public accommodation. This is so because the Unruh Act and the Disabled Persons Act must not be construed to apply to OHI, a religious organization.
>
> 3.    Finally, even if this Court were to conclude that either or both of these statutes apply to religious organizations, Defendants are nonetheless entitled to summary judgment; the statutes are constitutionally infirm for several reasons. First, the statutes are unconstitutionally vague and overbroad because whether they apply to religious organizations is unclear. Second, if they are to be applied to OHI in this case, such application would run afoul of other constitutional protections afford to OHI.

(ECF No. 69-1 at 7).

Plaintiff contends that "OHI's nonmember transactions are subject to the Unruh Act and

DPA." (ECF No. 68-1 at 14).  Plaintiff contends that caselaw regarding membership decisions "is instructive but is inapplicable to the present case" because Plaintiff "wanted to attend OHI's detoxification program as a 'guest,' not as an adherent" and "the general public, even 'nonbelievers,' can purchase access to the detoxification program because admission to the program is not based on religious beliefs." *Id*. at 14-15.  Plaintiff contends that "the Unruh Act and the DPA apply to religious entities and the DPA includes the specific prohibition that places of public accommodation must not interfere with the use of a guide dog." (ECF No. 79 at 14).  Plaintiff contends:

> In response to [Defendants' constitutional] arguments, [Plaintiff] first asserts that factual disputes preclude summary judgment in favor of OHI because there is significant evidence to challenge whether the 'religious beliefs' asserted by Defendants in this action are sincerely held. [Plaintiff] next asserts that, despite these factual disputes, she is entitled to judgment in her favor on the issue of liability because, even if these disputed facts are resolved against her and in Defendants' favor, her claims under the Acts survive Defendants' challenges because the Acts advance an important and compelling State interest – eliminating discrimination against people with disabilities.

*Id*. at 17.

## V.      Standard of Review

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The materiality of a fact is determined by the substantive law governing the claim or defense.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson*, 477 U.S. at 248).

The moving party has the initial burden of demonstrating that summary judgment is proper.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).  The burden then shifts

to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate.  *See Celotex*, 477 U.S. at 322, 324.  The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in his favor.  *See Anderson*, 477 U.S. at 256.  To avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact or law.  *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).  Instead, the nonmovant must designate which specific facts show that there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.  "[T]he mere fact that the parties make cross-motions for summary judgment does not necessarily mean that there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other."  *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975); *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038 n.6 (9th Cir. 2000) (same).

## VI.    Analysis

### A.    Unruh Act and Disabled Persons Act

#### 1.    "Business Establishment" and "Public Accommodation"

Pursuant to the Unruh Civil Rights Act, "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their ... disability ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  "[T]he term 'business establishments' must properly be interpreted in the broadest sense reasonably possible."  *Curran v. Mount Diablo Council of the Boy Scouts*, 17 Cal. 4th 670, 696 (1998) (quotation omitted).  "California decisions consistently have treated the issue whether a particular kind of entity constitutes a 'business establishment' for purposes of section 51 as a question of statutory interpretation to be decided by the court."  *Warfield v. Peninsula Golf & Country Club*, 10 Cal. 4th 594, 607 n.7 (1995).

The Unruh Act creates a private right of action against anyone who "denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51."  Cal. Civ. Code § 52(a).  Pursuant to the Unruh Act, a defendant may be held liable for "actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a

maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000)," as well as attorney's fees. *Id.* A plaintiff may also seek injunctive relief. *See* Cal. Civ. Code § 52(c)(3); *see also* Cal. Civ. Code § 52.1(b).

The Disabled Persons Act states:

> Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, medical facilities, including ... private schools, hotels, lodging places, places of public accommodation, amusement, or resort, and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons.

Cal. Civ. Code § 54.1(a)(1). The Disabled Persons Act states that "[e]very individual with a disability has the right to be accompanied by a guide dog, signal dog, or service dog, especially trained for the purpose, in any of the places specified in Section 54.1 without being required to pay an extra charge or security deposit for the guide dog, signal dog, or service dog." Cal. Civ. Code § 54.2(a). The Disabled Persons Act allows suits for interference with the right to access public accommodations, and provides for "actual damages and any amount as may be determined by a jury ... up to a maximum of three times the amount of actual damages but in no case less than one thousand dollars ($1,000), and attorney's fees ... suffered by any person denied any of the rights provided in Sections 54, 54.1, and 54.2." Cal. Civ. Code § 54.3(a).

While the Unruh Civil Rights Act is applicable to "business establishments" and the Disabled Persons Act is applicable to "public accommodations" (as well as a number of enumerated locations), California courts have held that the two terms are closely related and analyzed them together. *See Californians for Disabilities Rights v. Mervyn's LLC*, 165 Cal. App. 4th 571, 586 (2008) ("The [Unruh] Act and the DPA entitled disabled individuals to full and equal access to public accommodations."). The California Supreme Court has stated that "[t]he Unruh Civil Rights Act and the Disabled Persons Act clearly have significant areas of overlapping application, although the Unruh Civil Rights Act, of course, applies to many more types of discrimination, while the Disabled Persons Act contains unique specific provisions regarding guide, service, and signal dogs (§ 54.2) and may apply to more public places, facilities, and services than the Unruh Civil Rights Act." *Munson v. Del Taco, Inc.*, 46 Cal.

4th 661, 675 (2009) (citations omitted).

Although places of public accommodation and business establishments are required to permit access by the disabled, the Unruh Civil Rights Act does not apply to "truly private social clubs," *see Warfield*, 10 Cal 4th at 617, or to "membership decisions of a charitable, expressive, and social organization," *see Curran*, 17 Cal. 4th at 696. "[T]he very broad 'business establishments' language of the [Unruh] Act reasonably must be interpreted to apply to the membership policies of an entity–even a charitable organization that lacks a significant business-related purpose–if the entity's attributes and activities demonstrate that it is the functional equivalent of a classic 'place of public accommodation or amusement.'" *Id*. at 697 (quoting *Isbister v. Boys' Club of Santa Cruz*, 40 Cal. 3d 72, 83 (1985)).

In *Isbister*, the California Supreme Court held that the Boys' Club of Santa Cruz, a recreational facility that was open to all boys in the community–but excluded girls–and was owned and operated by a charitable, nonprofit organization, constituted a "business establishment" within the meaning of the Unruh Act. The court stated that "the Club's status as a 'business establishment' covered by the act arises from its 'public' nature; it offers basic recreational facilities to a broad segment of the population, excluding only a particular group expressly recognized by the Act as a traditional target of discrimination." *Isbister*, 40 Cal. 3d at 84. The court stated:

> The Act covers 'business establishments' of every kind, and these include traditional 'public accommodations.' Yet we have emphasized that the statute does not govern relationships that are truly private ... those which are 'continuous, personal and social' and take place more or less outside 'public view.' 'Private' groups and institutions do not fall prey to the Act simply because they operate 'nongratuitous' residential or recreational facilities for their members or participants; an accommodation must be 'public' to be covered.

*Id*. at 84 n.14 (citations omitted). The court stated:

> [T]he Club is classically 'public' in its operation. It opens its recreational doors to the entire youthful population of Santa Cruz with the sole condition that its users be male. There is no attempt to select or restrict membership or access on the basis of personal, cultural, or religious affinity, as a private club might do.... While there are some organized activities, the emphasis is on drop-in use of the Club's facilities, thus minimizing any sense of social cohesiveness, shared identity, or continuity.... [T]he Club provides an atmosphere deemed characteristic of a 'public accommodation'...; relations with and among its members are of a kind which take place more or less in public view, and are of a relatively nongratuitous, noncontinuous, nonpersonal and nonsocial sort.

*Id.* at 81 (quotations omitted).

In *Warfield*, the California Supreme Court held that a private golf and country club that excluded women from membership constituted a "business establishment" within the meaning of the Unruh Act. The court stated:

> [W]e conclude that there is no need to determine whether defendant constitutes a 'private club' rather than a place of public accommodation..., because we conclude that *the business transactions that are conducted regularly on the club's premises with persons who are not members of the club* are sufficient in themselves to bring the club within the reach of [the Unruh Act]'s broad reference to 'all business establishments of every kind whatsoever.'...
>
> [T]he club regularly (on the average of once a week) permits nonmembers to use its facilities, for a fee, in connection with 'sponsored events.' In conducting such events, the club receives funds from nonmembers for the use of the club's golf course, tennis courts, and dining and bar facilities, and also obtains revenue from the sale (at a markup) of food and beverages to nonmembers at the club's snack bar and other dining facilities on the club's premises. In carrying on such activities for a fee, the club operates as the functional equivalent of a commercial caterer or a commercial recreational resort—classic forms of 'business establishments'—and, indeed, presumably competes with business entities that offer comparable services and that clearly are subject to the strictures of [the Unruh Act]....
>
> In our view, because of the involvement of defendant's operations in the variety of regular business transactions with nonmembers discussed above, the club properly must be considered a business establishment within the meaning of section 51. Although the club is a nonprofit organization, ... the direct and indirect financial benefits that the club derived from its business transactions with nonmembers nonetheless inured to the financial benefit of the club members, because the revenue from such transactions permitted the members to maintain the club's facilities and services—which were reserved primarily for the benefit of the members—through the payment of dues and fees lower than would have been required in the absence of the income obtained from nonmembers.

*Warfield*, 10 Cal. 4th at 621, 623.

In *Curran*, the California Supreme Court held that the Boys Scouts "is not a business establishment whose membership policies or decisions fall within the reach of the [Unruh] Act," and therefore the Unruh Act did not prohibit the Boy Scouts from excluding gay members. 17 Cal. 4th at 700. The court addressed *Isbister*, and stated:

> [W]e do not believe that the circumstance that the Boy Scouts is generally nonselective in its admission policies, and affords membership to a large segment of the public, is itself sufficient to demonstrate that the organization reasonably can be characterized as the functional equivalent of a traditional place of public accommodation or amusement. The record establishes that the Boy Scouts is an organization whose primary function is the inculcation of a specific set of values in its youth members, and whose recreational facilities and

activities are complementary to the organization's primary purpose.  Unlike membership in the Boys' Club of Santa Cruz, Inc., membership in the Boy Scouts is not simply a ticket of admission to a recreational facility that is open to a large segment of the public and has all the attributes of a place of public amusement.  Scouts meet regularly in small groups (often in private homes) that are intended to foster close friendship, trust and loyalty, and scouts are required to participate in a variety of activities, ceremonies, and rituals that are designed to teach the moral principles to which the organization subscribes.

*Id*. at 697-98.  The court then addressed *Warfield*, and stated:

Although the record in this case indicates that the Boy Scouts, like the country club in *Warfield*, engages in business transactions with nonmembers on a regular basis (through the operation of retail shops and the licensing of the use of its insignia), the Boy Scouts' business activities differ from those of the defendant in *Warfield* in a very significant respect.  As we have seen, the Boy Scouts is an expressive social organization whose primary function is the inculcation of values in its youth members, and whose small social group structure and activities are not comparable to those of a traditional place of public accommodation or amusement.  Unlike those involved in *Warfield*, the business transactions with nonmembers engaged in by the Boy Scouts do not involve the sale of access to the basic activities or services offered by the organization.  Nonmembers cannot purchase entry to pack or troop meetings, overnight hikes, the national jamboree, or any portion of the Boy Scouts' extended training and educational process.  Although we have no doubt that the Unruh Civil Rights Act would apply to, and would prohibit discrimination in, the actual business transactions with nonmembers engaged in by the Boy Scouts in its retail stores and elsewhere ... we conclude that such transactions do not render the Boy Scouts a business establishment so as to bring its membership policies or decisions within the reach of the Unruh Civil Rights Act.  Those business transactions are distinct from the Scouts' core functions and do not demonstrate that the organization has become a commercial purveyor of the primary incidents and benefits of membership in the organization.

*Id*. at 699-700.

In *Doe v. California Lutheran High School Association*, 170 Cal. App. 4th 828 (2009), the California Court of Appeal held that, with respect to admission decisions, a private religious high school is not a "business establishment" with the meaning of the Unruh Act. The court stated:

*Curran* is controlling here.  Just like the Boy Scouts, the School is an expressive social organization whose primary function is the inculcation of values in its youth members.  According to its mission statement, ... '[the school] exists to glorify God by using his inerrant Word to nurture discipleship in Christ, serving primarily the youth of our ... congregations, equipping them for a lifetime of service to their Savior, their homes, churches, vocations and communities.'

Moreover, admission to the School, unlike membership in the Boy Scouts, is effectively selective and based on these values.

*Id*. at 838-39 (quotation omitted).  The court rejected plaintiffs' contention that the school

"engages in business transactions with the general public," such as selling tickets to football games and selling T-shirts. *Id.* at 839. The court stated that "unlike the nonmember transactions in *Warfield*—but like the nonmember transactions in *Curran*—these transactions do not involve the sale of access to the basic activities or services offered by the organization." *Id.* (quotation omitted). The court stated that, as in *Curran*, the school "could be a business, and be hence prohibited from discriminating, with respect to its nonmember transactions, yet *not* be a business, and hence *not* be prohibited from discriminating, with respect to its membership decisions." *Id.* (citing *Curran*, 17 Cal. 4th at 700).

The parties have stipulated that "OHI does not make decisions about who may attend its program based on religious beliefs." (Stipulation of Facts ¶ 89, ECF No. 67). Attendees of OHI's program who are not missionaries or employees of Free Sacred Trinity Church "are not required to adhere to any specific religious value or belief or ... be a member of OHI or [Free Sacred Trinity Church]" and "are not required to participate in any of the activities offered by OHI during its program...." *Id.* ¶¶ 89, 91. OHI, like the country club in *Warfield*, but unlike the Boy Scouts in *Curran* and the school in *Doe*, offers "the sale of access to the basic activities or services offered by the organization" to nonmembers, nonadherents and nonbelievers. *Curran*, 17 Cal. 4th at 699-700; *see Warfield*, 10 Cal. 4th at 621 ("*[T]he business transactions that are conducted regularly on the club's premises with persons who are not members of the club* are sufficient in themselves to bring the club within the reach of [the Unruh Act]'s broad reference to 'all business establishments of every kind whatsoever.'") (emphasis in original); *cf. Curran*, 17 Cal. 4th at 700 ("Nonmembers cannot purchase entry to pack or troop meetings, overnight hikes, the national jamboree, or any portion of the Boy Scouts' extended training and educational process.... [The] business transactions [with nonmembers] are distinct from the Scouts' core functions and do not demonstrate that the organization has become a commercial purveyor of the primary incidents and benefits of membership in the organization."); *Doe*, 170 Cal. App. 4th at 839 ("[U]nlike the nonmember transactions in *Warfield*—but like the nonmember transactions in *Curran*—these transactions [with the public] do not involve the sale of access to the basic activities or services offered by

the organization.").  Although "a primary function of [OHI] is to teach its specific program to attendees," Stipulation of Facts ¶ 19, ECF No. 67, unlike the Boy Scouts and the school students in *Doe*, OHI attendees are not required to attend or participate in any of the program activities, and attendees are not required to adhere to any beliefs or values.  *Cf. Curran*, 17 Cal. 4th at 698 ("[S]couts are *required* to participate in a variety of activities, ceremonies, and rituals that are designed to teach the moral principles to which the organization subscribes.") (emphasis added); *Randall v. Orange County Council*, 17 Cal. 4th 736 (1998) (holding that the Unruh Act does not prohibit Boy Scouts from excluding plaintiffs from membership or participation because of plaintiffs' refusal to participate in the religion-based elements of the scout program); *Doe*, 170 Cal. App. 4th at 838 ("[A]dmission to the School ... is effectively selective and based on [Lutheran] values."); *cf. also Isbister*, 40 Cal. 3d at 81 (finding the Boy's Club of Santa Cruz to be a "business establishment" in part because "[t]here is no attempt to select or restrict membership or access on the basis of personal, cultural, or religious affinity, as a private club might do").  After review of the undisputed facts and the relevant legal authority, the Court finds that there is no genuine issue of material fact that, as applied to Plaintiff, OHI is a "business establishment" pursuant to the Unruh Act and a "public accommodation" pursuant to the Disabled Persons Act.[1]

### 2.      Liability under the Unruh Act and the Disabled Persons Act

Based upon the stipulated facts, OHI would only allow Plaintiff admittance to OHI if Plaintiff brought a sighted companion to accompany her and Plaintiff paid "half-price" for the companion.  (Stipulation of Facts ¶ 80, ECF No. 67).  There is no dispute that this requirement was placed upon Plaintiff solely because of her blindness.  *Id.* ¶¶ 26, 76-78, 80-82.  Plaintiff informed Defendants that this requirement was "an unnecessary and significant burden on her," and Plaintiff offered to "tour[] the OHI facility and ... show Nees that she could successfully navigate the OHI facility."  *Id.* ¶ 81.  "OHI told [Plaintiff] that she would be welcome at OHI, but only if she brought a companion."  *Id.* ¶ 84.

---

[1]  The Court finds that, as applied to the facts of this case, the Unruh Act and the Disabled Persons Act have "overlapping application."  *Munson*, 46 Cal. 4th at 675.

With respect to Plaintiff's attempt to attend OHI alone, without a service animal and with a cane, the Court finds that there is no genuine issue of material fact that OHI violated the Unruh Act by "den[ying] or mak[ing] [a] discrimination or distinction contrary to Section 51 [of the California Civil Code]."  Cal. Civ. Code § 52(a); *see* Cal. Civ. Code § 51(b) ("All persons within the jurisdiction of this state are free and equal, and no matter what their ... disability ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.").  The Court finds that there is no genuine issue of material fact that Defendant Nees violated the Unruh Act as well.  *See North Coast Women's Care Med. Group, Inc. v. San Diego County Superior Court*, 44 Cal. 4th 1145, 1154 (2008) ("[L]iability under the [Unruh] Act for denying a person the 'full and equal accommodations, advantages, facilities, privileges, or services' of a business establishment extends beyond the business establishment itself to the business establishment's employees responsible for the discriminatory conduct.") (citing Cal. Civ. Code § 51(b)).  With respect to Plaintiff's attempt to attend OHI alone, without a service animal and with a cane, the Court finds that there is no genuine issue of material fact that Defendants violated the Disabled Persons Act by "den[ying] or interfer[ing] with admittance to or enjoyment of the public facilities ... or otherwise interfer[ing] with the rights of an individual with a disability...."  Cal. Civ. Code § 54.3(a) ("Any person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 or otherwise interferes with the rights of an individual with a disability under Sections 54, 54.1 and 54.2 is liable...."); *see* Cal. Civ. Code § 54.1(a)(1) ("Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to ... places of public accommodation, amusement, or resort, and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons.").

Defendants contend that, "if they are held to be subject to the Unruh Act or the DPA, material questions of fact remain regarding whether Defendants' actions were reasonable and justified under the circumstances."  (ECF No. 80 at 30).  Defendants contend that "it was not

possible to accommodate Plaintiff's specific demands, but [Defendants] point out that they offered to welcome Plaintiff to OHI with a sighted companion in order to ensure her safety along with the sanctity of the OHI program. It was a reasonable accommodation." *Id.* at 30-31. As support for their contention, Defendants cite to authority that "'[w]hether a blind person may be accompanied by a guide dog in a particular area of a medical facility would depend upon the individual circumstances.'" *Id.* at 27 (quoting 70 Cal. Op. Att'y Gen 104 (1987)). Defendants also cite authority that a driver's license and a pilot's license may not be issued to a person who is blind. *See id.* at 29.

"Although the Unruh Act proscribes any form of arbitrary discrimination, certain types of discrimination have been denominated reasonable and, therefore, not arbitrary." *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 30 (1985) (quotations omitted). "For example, the Act does not prevent a business enterprise from promulgating reasonable deportment regulations. An entrepreneur need not tolerate customers who damage property, injure others or otherwise disrupt his business." *Id.* (quotations omitted). "In certain contexts, it has been said that the Act is inapplicable to discrimination between patrons based on the nature of the business enterprise and of the facilities provided. However, few cases have held discriminatory treatment to be nonarbitrary based solely on the special nature of the business establishment." *Id.* (quotation omitted). "Most often, the nature of the business enterprise or the facilities provided has been asserted as a basis for upholding a discriminatory practice only when there is a strong public policy in favor of such treatment." *Id.* at 31 (citation omitted). "For example, it is permissible to exclude children from bars or adult bookstores because it is illegal to serve alcoholic beverages or to distribute harmful matter to minors. This sort of discrimination is not arbitrary because it is based on a compelling societal interest and does not violate the Act." *Id.* (quotation omitted). A defendant may not rely upon "an unsubstantiated and totally speculative concern" to justify a discriminatory practice. *Hankins v. El Torito Restaurants, Inc.*, 63 Cal. App. 4th 510, 520 (1998) ("[W]e decline to find that an unsubstantiated and totally speculative concern that El Torito would be unable to prevent a patron from surreptitiously sampling food on the way to or from the [employee] rest room

justifies denying a handicapped patron access to the only first floor restroom on the premises."); *cf.* 28 C.F.R. § 36.301(b) ("A public accommodation may impose legitimate safety requirements that are necessary for safe operation.  Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."); 28 C.F.R. § 36.208 ("This part does not require a public accommodation to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of that public accommodation when that individual poses a direct threat to the health or safety of others....  Direct threat means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services."); *cf. also Lockett v. Catalina Channel Exp., Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007) ("[U]ltimately the entity asserting a 'direct threat' as a basis for excluding an individual bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others.").

In support of Defendants' policies which resulted in Plaintiff's exclusion from OHI, Defendants submit the affidavit of Defendant Nees.  *See* Nees Decl. ¶¶ 8-9, 28-29, ECF No. 80-2.  Defendants fail to establish a foundation for Nees' knowledge of the capabilities of blind individuals in general, and Plaintiff in particular, and the risks posed by Plaintiff's presence at OHI alone, without a service animal and with a cane.  Plaintiff submits evidence that she is capable of successfully and safely navigating stairs and kitchen appliances, and she informed OHI representatives of this.  *See* Stevens Decl. ¶¶ 5-11, ECF No. 68-6; Stipulation of Facts ¶¶ 78, 81, ECF No. 67.  Defendants have failed to dispute this evidence or introduce evidence that the OHI facility has unique stairs or kitchen appliances, more treacherous than those Plaintiff has previously encountered.  Defendants have failed to submit evidence that Plaintiff's presence at OHI unassisted and not in need of assistance, would nonetheless be disruptive.  With respect to Plaintiff's attempt to attend OHI alone, without a service animal and with a cane, the Court finds that there is no genuine issue of fact that Defendants relied upon "an unsubstantiated and totally speculative concern" to justify their discriminatory practice toward Plaintiff.  *Hankins*, 63 Cal. App. 4th at 520; *cf.* 28 C.F.R. § 36.301(b) ("Safety requirements

1  must be based on actual risks and not on mere speculation, stereotypes, or generalizations
2  about individuals with disabilities.").

3  The Court finds that Plaintiff is entitled to judgment as a matter of law as to Plaintiff's
4  claim that Defendants violated the Unruh Act and the Disabled Persons Act when Defendants
5  refused to allow Plaintiff to attend OHI alone, without a service animal and with a cane.

6  The Court finds that genuine issues of material fact preclude summary judgment for
7  either party as to the issue of whether Defendants' exclusion of Plaintiff with a service animal
8  was a "reasonable restriction rationally related to [OHI's] business and the services it offers."
9  *Hankins*, 63 Cal. App. 4th at 519-20; *see also Koire*, 40 Cal. 3d at 30.  *Compare* Nees Decl.
10  ¶¶ 17-18, ECF No. 80-2 ("The grounds of OHI are sacred.  In order to maintain a pure
11  environment for healing and worship, OHI cannot–and does not–welcome animals.... [I]n the
12  eyes of the Church, based upon the teachings of the Old Testament, OHI's grounds are sacred
13  but animals are not....  Allowing animals into the grounds is antithetical to the promotion of
14  a safe, healing environment at the Institute, particularly for people who have animal phobias
15  or allergies...."); OHI Frequently Asked Questions, ECF No. 80-2 at 17 ("Pets including
16  service animals are not permitted in any area of OHI.  During the detoxification process, guests
17  become very sensitive to aromas, contaminates and pet allergens.  In addition, some of our
18  program participants have phobias related to animals and cleanliness.  Therefore animals are
19  prohibited at OHI in order to provide a safe and sacred environment necessary for healing."),
20  *with* Kutsch Decl. at 6-11, ECF No. 68-7 (affidavit from purported expert witness detailing
21  accommodations that can be implemented to provide access for both a service animal and a
22  guests with phobias and/or sensitivity and alleergies).

23  **B.    Constitutional Defenses**

24  Defendants contend that application of the Unruh Act or the Disabled Persons Act
25  would result in violating the following constitutional rights of Defendants: (1) right to free
26  expressive association; (2) right to free exercise of religion; (3) supremacy clause "because the
27  Unruh Act and DPA are preempted by the ADA"; and (4) due process rights "because the
28  Unruh Act and DPA are unconstitutionally vague and overbroad."  (ECF No. 80 at 25, 26).

### 1.   Right to Free Expressive Association

Defendants contend that "court-ordered changes to OHI's policies ... or a finding that OHI violated these California enactments on these facts would impair the ability of OHI to express only those views (i.e., the tenets of the Church and the OHI program) that identify the Church." (ECF No. 80 at 21). Defendants contend that such a result "would impose an unconstitutional intrusion on the internal affairs of the Church and its mission, OHI, and restrict Defendants' right to freely associate." *Id*. Defendants contend that ordering OHI to admit Plaintiff without a helper "would be disruptive to the OHI program (regardless of whether [the] disruption would be caused by an assistance animal or by a disabled guest, in need of assistance)." *Id*. at 23.

Plaintiff contends:

> OHI cannot be an 'expressive association' if there is no common belief, value or viewpoint. Defendants urge that the detoxification program is 'expressive activity' because OHI has a primary function of teaching its specific program to attendees. Defendants next contend that OHI expresses its program, and the underlying Christian tenets, through religious worship and teaching as well as through the daily prayer circles and liturgies. (Plaintiff brings to the Court's attention that the parties never stipulated, and they hotly contest, that the 'specific program' was religious in nature for nonbeliever nonmembers.)
>
> It is nonsensical that the presence of Ms. Stevens would impede the expression of Christian tenets to guests who do not hold FSTC's Christian beliefs, like nonbeliever nonmember guests. The only people who might plausibly be affected are members of FSTC and OHI. Even if Defendants' right to expressive association is impacted, Defendants failed to establish that the impact is substantial. Defendants, for example, have offered no evidence that any of the people who attend OHI's detoxification program are members of FSTC or OHI and/or that any of them believe dogs defile spaces more than other animals that are not sacred and that roam OHI's multiacre facilities. Nor have they offered any evidence that the number of member attendees who may be affected is substantial.

(ECF No. 79 at 25-26).

The Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment–speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640,

648 (2000) (citation omitted).  "But the freedom of expressive association, like many freedoms, is not absolute.  We have held that the freedom could be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'"  *Id*. (quoting *Roberts*, 468 U.S. at 623).

In *Dale*, the Court held that applying New Jersey's public accommodations law to require the Boy Scouts to retain an assistant scoutmaster after he publicly declared he was homosexual violated the Boy Scouts' First Amendment right of expressive association.  The Court stated:

> We have ... concluded that a state requirement that the Boy Scouts retain Dale as an assistant scoutmaster would significantly burden the organization's right to oppose or disfavor homosexual conduct.  The state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association.  That being the case, we hold that the First Amendment prohibits the State from imposing such a requirement through the application of its public accommodations law.

*Id*. at 659.  In *Roberts*, the Court held that applying Minnesota's public accommodations law to require the United States Jaycees to admit women to its local Minnesota chapters did not violate the Jaycees' right of expressive association.  The Court stated:

> Assuring women equal access to such goods, privileges, and advantages clearly furthers compelling state interests.  In applying the Act to the Jaycees, the State has advanced those interests through the least restrictive means of achieving its ends.  Indeed, the Jaycees has failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association.

*Roberts*, 468 U.S. at 626.  In *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987), the Court held that application of the Unruh Act to California Rotary Clubs to require them to admit women does not interfere unduly with club members' freedom of private association and does not violate members' First Amendment right of expressive association.  The Court stated:

> In this case, ... the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes....  Even if the Unruh Act does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women.  On its face the Unruh Act, like the Minnesota public accommodations law we considered in *Roberts*, makes no distinctions on the basis of the organization's viewpoint.  Moreover, public

accommodations laws plainly serve compelling state interests of the highest order.  In *Roberts* we recognized that the State's compelling interest in assuring equal access to women extends to the acquisition of leadership skills and business contacts as well as tangible goods and services.  The Unruh Act plainly serves this interest.  We therefore hold that application of the Unruh Act to California Rotary Clubs does not violate the right of expressive association afforded by the First Amendment.

*Id.* at 548-49 (quotation omitted).

In determining whether "the presence of [Plaintiff at OHI] affects in a significant way [Defendants]' ability to advocate public or private viewpoints," *Dale*, 530 U.S. at 648, the Court must "give deference to an association's assertions regarding the nature of its expression," and "an association's view of what would impair its expression." *Id.* at 653. "That is not to say that an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* Even giving deference to Defendants, after review of the evidence in the record, the Court finds that Defendants have failed to create a genuine issue of material fact as to whether admitting Plaintiff to OHI without an assistant or service animal and using a cane "will affect in any significant way the existing members' ability to carry out their various purposes." *Duarte*, 481 U.S. at 548.  The Court further finds, as a matter of law, that "[e]ven if the [application of the Disabled Persons Act and/or the] Unruh Act [with respect to Plaintiff's presence alone, without a service animal and with a cane] does work some slight infringement on [OHI] members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against [the disabled]." *Id.* at 549.

With respect to Plaintiff's presence at OHI with a service animal, and giving appropriate deference to Defendants' "view of what would impair [their] expression," *Dale*, 530 U.S. at 653, the Court finds that the competing affidavits submitted by the parties create a genuine issue of material fact as to whether application of the Unruh Act and/or the Disabled Persons Act to Defendants would violate Defendants' First Amendment rights to free expressive association.

## 2.    Right to Free Exercise of Religion

In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court analyzed a free exercise of religion claim under a rational basis test. "Under this test, a rationally based, neutral law of general applicability does not violate the right to free exercise of religion even though the law incidentally burdens a particular religious belief or practice." *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999) (citing *Smith*, 494 U.S. at 879). In *Smith*, the Supreme Court stated: "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879 (quotations omitted). The Court stated: "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development."

"*Smith*, however, excepts a hybrid-rights claim from its rational basis test. In *Smith*, the Court distinguished the strict scrutiny imposed in 'hybrid situation[s]' in which a law 'involve[s] not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections.'" *Miller*, 176 F.3d at 1207 (quoting *Smith*, 494 U.S. at 881-82). "Although the Court has been somewhat less than precise with regard to the nature of hybrid rights," the Court of Appeals for the Ninth Circuit has held that, "to assert a hybrid-rights claim, a free exercise plaintiff must make out a colorable claim that a companion right has been violated–that is, a fair probability or a likelihood, but not a certitude, of success on the merits." *Id*. (quotations omitted). If a hybrid-rights claim is properly asserted, in order to survive strict scrutiny, application of the statute must "represent[] no infringement by the State of [the appellant's] constitutional rights of free exercise, or [the statute's proponent must show that] any incidental burden on the free exercise of appellant's religion may be justified by a compelling state interest in the regulation of a subject within the State's constitutional power to regulate." *Sherbert v. Verner*, 374 U.S. 398, 403 (1963).

Defendants concede that application of the Unruh Act and the Disabled Persons Act in this case satisfies the *Smith* analysis. (ECF No. 80 at 25 n.13). Defendants contend that the

*Smith* analysis does not apply and strict scrutiny applies because Defendants have asserted a hybrid right to free expressive association and right to free exercise of religion. Defendants contend that, "[a]lthough ... the California Legislature intended to advance the interest of the disabled with the Unruh Act and DPA, these enactments fail the *Sherbert* test because they are not the least restrictive means [to advance the interest]. The Legislature could have avoided Defendants' challenges with an express exemption for religious organizations." (ECF No. 80 at 25).

Plaintiff contends that the "hybrid rights theory" has been rejected by courts since *Smith*. Plaintiff contends that, even if strict scrutiny applied:

> [U]nder the 'least restrictive means' analysis, the issue is not whether the State can 'avoid a constitutional challenge,' but whether the statute is the least restrictive means by which a State can advance its interests. If the State's goal is to ensure that all business entities and places of public accommodation, including religious facilities, are accessible to people with disabilities, including people who use guide dogs, that interest is clearly not advanced by exempting religious entities from the Acts. Defendants have advanced no other means by which this important goal can be accomplished.

(ECF No. 79 at 22-23).

"Judges may not determine the truth or falsity of matters of faith. Even so, we must determine as a threshold matter whether [a person]'s beliefs are within the ambit of the First Amendment. In order for [a person] to invoke 'the protection of the Religion Clauses, [his] claims must be rooted in religious belief.'" *United States v. Ward*, 989 F.2d 1015, 1017 (9th Cir. 1992) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)); *see also Alvarado v. City of San Jose*, 94 F.3d 1223, 1230 (9th Cir. 1996) ("In *Wisconsin v. Yoder*, the Supreme Court distinguished in the Free Exercise context between 'religious conviction[s]' and 'personal,' 'isolated' convictions, stressing that the latter do 'not rise to the demands of the Religion Clauses.'") (quoting *Yoder*, 406 U.S. at 216).

With respect to Plaintiff's presence at OHI alone, without a service animal and with a cane, Defendants contend that "the sanctity of the spiritual paths of those in attendance" would be "disrupted" by Plaintiff because she would be "needing assistance in the unfamiliar environment of OHI." (ECF No. 80 at 24; Nees Decl. ¶ 29; ECF No. 80-2). There is no evidence in the record that Nees' conclusion that Plaintiff would be "needing assistance" (or

Nees' apparent assumption that other attendees at OHI would believe Plaintiff would be in need of assistance) originates from a religious conviction or belief. Defendants have pointed to no religious tenet of OHI that mandates blind people be assisted when they need no assistance. Based upon the record, the Court finds as a matter of law that Nees' personal beliefs regarding Plaintiff's abilities to navigate stairs and/or kitchen appliances does not fall "within the ambit of the First Amendment." *Ward*, 989 F.2d at 1017. Even if Nees' personal beliefs regarding Plaintiff's abilities fell within the ambit of the First Amendment, the Court finds that, as a matter of law, the State of California's goal to ensure that all business establishments and places of public accommodation are accessible to people with disabilities is a compelling State interest. *See Duarte*, 481 U.S. at 549 ("[P]ublic accommodations laws plainly serve compelling state interests of the highest order.") (quotation omitted). The Court further finds as a matter of law that this interest is advanced in the manner least restrictive to Defendants' religion by requiring Defendants to allow Plaintiff to attend the OHI program unassisted, without a service animal and with a cane. *Cf. Sherbert*, 374 U.S. at 403.[2]

In a footnote, Defendants contend that, "[a]though the California Constitution has not 'played an independent role in free exercise claims' apart from that of the First Amendment to the United States Constitution, Defendants assert and rely upon the free exercise protections of the California Constitution to the extent that, in this matter, they extend beyond those provided by the First Amendment." ECF No. 69-1 at 29 n.11 (quoting *Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004)). To the same extent the Court finds that Defendants' U.S. Constitution free exercise claim fails, the Court finds Defendants' California Constitution free exercise claim fails.

---

[2] The Court assumes without deciding that the *Sherbert* compelling interest analysis applies to Defendants' purported "hybrid rights" claim. Because the Court finds that application of the statutes at issue to Plaintiff, unassisted and using a cane, satisfies the compelling interest analysis, the Court need not decide whether the *Sherbert* analysis applies, or whether a less stringent analysis applies. *Cf. Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1147-48 (9th Cir. 2000) (collecting cases regarding "the jurisprudential thicket surrounding the intersection of First Amendment free exercise concerns and civil rights") (O'Scannlain, concurring). With respect to Plaintiff's presence at OHI with a service animal, if the *Sherbert* compelling interest analysis applies, there would be a genuine issue of material fact as to Defendants' free exercise of religion claim, precluding summary judgment for either party.

### 3.     Preemption

The Americans with Disabilities Act ("ADA") contains an exemption for religious organizations.  *See* 42 U.S.C. § 12187 ("The provisions of this subchapter shall not apply to private clubs or establishments ... or to religious organizations or entities controlled by religious organizations, including places of worship.").  Defendants contend that, if the Court finds that the Unruh Act and/or the Disabled Persons Act apply to OHI, the religious organizations exemption of the ADA conflicts with the California statutes and preempts them.

"In determining whether a state statute is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress.  Federal law may supersede state law in several different ways." *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987) (citations omitted).  The only relevant way to this case is "in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law." *Id*. at 281.  "Such a conflict occurs either because compliance with both federal and state regulations is a physical impossibility, or because the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. (quotations omitted).  "Nevertheless, pre-emption is not to be lightly presumed." *Id*.

Section 501(b) of the ADA states:

> Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.

42 U.S.C. § 12201(b).  The legislative history indicates that with Section 501(b) Congress did not "intend to displace any of the rights or remedies available under other federal or state laws (including state common law) which provide greater or equal protection to individuals with disabilities." House Report No. 101-485(II), 101st Cong., 2d Sess., at 135 (1990), U.S. Code Cong. & Admin. News 1990, at 267, 418.   "Under Section 501(b) of the ADA, all of the rights, remedies and procedures that are available to people with disabilities under other federal laws, including Section 504 of the Rehabilitation Act, or other state laws (including state common law), are not preempted by this Act."  House Report No. 101-485(III), at 70, U.S.

1    Code Cong. & Admin. News 1990, at 493.

2        The California Legislature, when it amended the Unruh Act and the Disabled Persons

3 Act to state that violations of the ADA were violations of the California statutes, specifically

4 retained California law where it provides broader protection for people with disabilities. *See*

5 *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 669 (2009) ("The general intent of the [Unruh Act]

6 legislation was ... to strengthen California law in areas where it is weaker than the Americans

7 with Disabilities Act of 1990 ... and to retain California law when it provides more protection

8 for individuals with disabilities than the Americans with Disabilities Act of 1990.") (quotation

9 omitted)); *see also* Cal. Civ. Code § 54.1(a)(3) ("'Full and equal access,' for purposes of this

10 section ..., means access that meets the standards of ... the Americans with Disabilities Act of

11 1990 ..., except that, if the laws of this state prescribe higher standards, it shall mean access

12 that meets those higher standards.").

13        The Court finds that it was the intent of the U.S. Congress that the ADA not preempt

14 more expansive state laws such as the Unruh Act and the Disabled Persons Act. The Court

15 finds that the religious organizations exemption in the ADA does not actually conflict with or

16 otherwise preempt the application of the Unruh Act and the Disabled Persons Act in this case.

17        In a related argument, Defendants contend: "With regard to the DPA, ... Section 54.1

18 expressly states that its reach is subject to the 'conditions and limitations established by law,

19 or state or federal regulation....' and federal law provides such a limitation; it is found in 42

20 U.S.C. § 12187's exemption for religious organizations." (ECF No. 80 at 17). Section 54.1

21 of the Disabled Persons Act provides: "Individuals with disabilities shall be entitled to full and

22 equal access, as other members of the general public, to ... places of public accommodation,

23 amusement, or resort, and other places to which the general public is invited, subject only to

24 the conditions and limitations established by law, or state or federal regulation, and applicable

25 alike to all persons." Cal. Civ. Code § 54.1(a)(1). The "limitations" referenced in § 54.1

26 relates to "the limitations to which all persons are subject," such as fire regulations applicable

27 to all persons. *Marsh v. Edwards Theatres Circuit, Inc.*, 64 Cal. App. 3d 881, 980 (1976). The

28 Court does not find the ADA religious organizations exemption to be the type of "limitation

established by law ... and *applicable alike to all persons*" referenced in § 54.1 of the Disabled Persons Act.  Cal. Civ. Code § 54.1(a)(1) (emphasis added).

### 4.    Vagueness

"The void-for-vagueness doctrine reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."  *Roberts*, 468 U.S. at 629 (quotation omitted).  In *Roberts*, the Court held that Minnesota's public accommodations law was not unconstitutionally vague and overbroad.  The Court stated:

> We have little trouble concluding that these [vagueness] concerns are not seriously implicated by the Minnesota Act, either on its face or as construed in this case.  In deciding that the Act reaches the Jaycees, the Minnesota Supreme Court used a number of specific and objective criteria–regarding the organization's size, selectivity, commercial nature, and use of public facilities–typically employed in determining the applicability of state and federal antidiscrimination statutes to the membership policies of assertedly private clubs.

*Id*. (citations omitted).

Defendants contend that the Unruh Act and Disabled Persons Act are void for vagueness "because Defendants cannot ascertain from the language of the statutes whether OHI is subject to these enactments, although Defendants do contend that the exemption provided by [the ADA for religious organizations] was incorporated by reference in the Unruh Act's 1992 amendments and Section 54.1 of the DPA."  (ECF No. 80 at 25-26).

As discussed above, the ADA states that more expansive State laws are not preempted.  *See* 42 U.S.C. § 12201(b); *see also* 28 C.F. R. § 36.103(c).  The Unruh Act and the Disabled Persons Act do not contain an exemption for religious organizations.  The California Court of Appeal has held that the Unruh Act is applicable to a nonprofit religious corporation.  *See Pines v. Tomson*, 160 Cal. App. 3d 370 (1984) (nonprofit religious corporation that publishes a business telephone directory held to be a business establishment subject to the Unruh Act); *see also Curran*, 17 Cal. 4th at 697 n.16 (citing *Pines*).  Since at least 1981, Title 24 of the California Code of Regulations has required that "[r]eligious facilities shall be made accessible to the physically handicapped."  ECF No. 79-2 at 3, *see also id*. at 4-6.  As was the case in

- 29 -

*Roberts*, the criteria used by California courts in determining whether the Unruh Act and the Disabled Persons Act apply are similar to those "typically employed in determining the applicability of state and federal antidiscrimination statutes." *Roberts*, 468 U.S. at 629; *see, e.g.*, *Warfield*, 10 Cal. 4th at 620 (listing factors from numerous cases, including *Roberts*, which are "relevant to th[e] determination" of whether a club's "membership decisions are exempt from a generally applicable public accommodation law").

The Court concludes that, as a matter of law, the Unruh Act and the Disabled Persons Act are not unconstitutionally vague and overbroad.

### C.    Doctrine of Constitutional Avoidance

Defendants contend: "There is no apposite precedent applying the Unruh Act or DPA to a religious organization as Plaintiff's claims require.  The canon of constitutional avoidance militates a narrow construction of these California enactments and a conclusion that they do not apply to religious organizations."  (ECF No. 69-1 at 24).

"[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice.  If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."  *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005); *see also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). This "maxim of statutory construction" "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."  *Clark*, 543 U.S. at 381.  A court "may invoke the doctrine only if [the court] ha[s] 'grave doubts' about the constitutionality of the statute."  *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1143 (9th Cir. 2009) (quoting *Almendarez-Torres v. U.S.*, 523 U.S. 224, 237-38 (1998)).

Based upon the record before the Court, and for the reasons discussed above, the Court

does not have "grave doubts" about the constitutionality of either the Unruh Act or the Disabled Persons Act either facially or as applied to Defendants.  Accordingly, the Court finds that the doctrine of constitutional avoidance does not apply.

### D.    Evidentiary Objections

Any objections to evidence cited in this Order are overruled.  Any objections to evidence not cited in this Order are denied as moot.

## VII.   Conclusion

IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part, as discussed in this Order.  (ECF No. 68). Defendants' Motion for Summary Judgment and/or Partial Summary Judgment is DENIED. (ECF No. 69).  Plaintiff is entitled to judgment as a matter of law as to Plaintiff's claim that Defendants violated the Unruh Act and the Disabled Persons Act when Defendants refused to allow Plaintiff to attend OHI alone, without a service animal and with a cane.  Genuine issues of material fact preclude judgment as a matter of law for either party as to Plaintiff's claim that Defendants violated the Unruh Act and the Disabled Persons Act when Defendants refused to allow Plaintiff to attend OHI with a service animal.

No later than twenty (20) days from the date of this Order, the parties shall filed a joint status report identifying the issues that remain to be resolved in this case in light of the rulings in this Order.

DATED:  August 24, 2011

**WILLIAM Q. HAYES**
United States District Judge